## COMMONWEALTH *vs.* VENTRY GORDON
### (and six companion cases[1]).

Middlesex. September 12, 1995. - June 10, 1996.

Present: LIACOS, C.J., WILKINS, LYNCH, & O'CONNOR, JJ.

*Jury and Jurors. Practice, Criminal,* Fair trial, Voir dire, Presumptions and
burden of proof, Public trial, Trial of defendants together, Severance,
Mistrial, Opening statement, Argument by prosecutor, Agreement be-
tween prosecutor and witness, Discovery, View, Required finding,
Instructions to jury, Capital case. *Constitutional Law,* Public trial, Jury.
*Evidence,* Videotape, Expert opinion, Scientific test, Joint enterprise,
Consciousness of guilt. *Identification. Robbery. Homicide. Felony-Murder
Rule. Joint Enterprise. Receiving Stolen Goods.*

Before a murder trial which was projected to last six weeks the judge
properly exercised her discretion to excuse a potential juror, one of two
in the venire of 200 who were black, for reasons of undue hardship and
unusual inconvenience, and the three defendants, who were black, were
not thereby denied a fair trial. [821-822]

At a murder trial, the judge appropriately refused to grant a mistrial on the
basis that some of the jurors in the venire as a whole may not have
heard the questions posed by the judge pursuant to G. L. c. 234, § 28,
where no statutory violation was shown and where the judge repeated
the substance of § 28 to the jury after empanellment was completed.
[822-823]

Criminal defendants' rights to a public trial were not violated by the judge's
exclusion of the public, including members of the defendants' families,
from the courtroom during the preliminary hardship colloquies of the
prospective jurors. [823-824]

At the trial of three codefendants for two murders the judge correctly
denied one defendant's motions for a mistrial on the ground that a
codefendant's attorney stated in opening that his client would testify
that the first defendant admitted the murder, where there were several
independent eyewitnesses who identified the first defendant as the
murderer, thus no prejudice in the codefendant's testimony was shown,
and where the judge repeatedly instructed the jury that an opening
statement was not evidence. [824-827]

At a murder trial there was no reversible error arising from the prosecutor's
opening, presentation of the evidence or closing argument which in part

[1]Three indictments against Sean Lee, two against Ventry Gordon, and
one against Ronald Settles. In the interest of judicial economy, we shall
consider Settles' appeal along with the appeals properly before this court.

improperly appealed to the emotions of the jury where, in the circumstances and because the judge gave explicit mitigating instructions, the defendants were not prejudiced by the misconduct. [827, 830-831]

General Laws c. 272, §§ 99 B 4 and 99 C 1, do not operate to make unlawful the administrative recording of the video and audio aspects of police booking procedures without the knowledge of the persons being booked; the judge at a criminal trial properly admitted the tapes as relevant to defendants' state of intoxication or sobriety shortly after the murders for which they had been arrested. [832-833]

At a criminal trial the judge properly admitted in evidence the testimony of a party to a nonprosecution agreement where the agreement did not present an inducement for the witness to lie, where the witness was vigorously cross-examined, and where the judge properly instructed the jury with respect to their assessment of such a witness's testimony. [833-835]

At the trial of indictments for murder the defendants were not prejudiced by the prosecution's failure to comply with discovery obligations with respect to the substance of the testimony of the Commonwealth's forensic serologist and the consumption of the blood samples in question during testing, where the judge granted the defendants time to locate an expert witness to counter the Commonwealth's expert's testimony and where defense counsel mounted an effective cross-examination of the Commonwealth's witness and challenged the witness's opinion with their own expert. [835-837]

At a murder trial there was no error in the judge's admitting in evidence an expert's opinion that the results of certain tests for occult blood on the defendants were consistent with and presumptive of but not specific for the presence of blood, where the principles underlying the test in question were generally accepted in the scientific community; further, the witness's conclusion, based on her own observations and experience, that the test results did in fact indicate the presence of blood on the defendants and were not false positives, was properly admitted. [837, 840-842]

No judicial error or prosecutorial misconduct occurred at a murder trial nor was there unfairness in an identification of one defendant for the first time by a witness on the witness stand, where the witness completely repudiated the identification on cross-examination. [842-849]

There was no error at the trial of a murder case in the judge's denial of one defendant's request to accompany the jury on a view. [849-849]

Sufficient evidence was introduced at a criminal trial to warrant the jury's conviction of one defendant of first degree murder based on a theory of joint venture felony-murder. [849-852]

There was no error at the trial of indictments for armed robbery and murder in the judge's denial of one defendant's request for an instruction on receiving stolen property with respect to the article stolen from the victim. [852-852]

At a criminal trial there was no error in the judge's having given a general instruction on consciousness of guilt even though there was no such evidence introduced against one of the three defendants, where the instruction did not suggest there was any evidence of consciousness of guilt of that particular defendant. [852]

No reason appeared for this court to exercise its power under G. L. c. 278, § 33E, to reduce verdicts of murder in the first degree or grant a new trial. [853]

INDICTMENTS found and returned in the Superior Court Department on November 8, 1990.

The cases were tried before *Wendie I. Gershengorn, J.*

*Willie J. Davis* for Ventry Gordon.

*John H. Cunha, Jr.,* for Sean Lee.

*Robert L. Sheketoff* for Ronald Settles.

*Sabita Singh,* Assistant District Attorney (*Richard W. Jensen,* Special Assistant District Attorney, with her) for the Commonwealth.

O'CONNOR, J. A jury found the defendants Ventry Gordon and Sean Lee guilty of murder in the first degree of Jesse McKie and Rigoberto Carrion and guilty of armed robbery of McKie. They found the murders committed by Gordon to have been premeditated and those committed by Lee to have been felony-murders. Ricardo Parks, who was also charged with murdering McKie and Carrion and with armed robbery of McKie, was acquitted of those charges. The jury found the defendant Ronald Settles guilty of being an accessory after the fact of assault and battery by means of a dangerous weapon on McKie. Settles was acquitted on a second indictment charging being an accessory after the fact of assault and battery by means of a dangerous weapon and on an indictment charging being an accessory after the fact of armed assault with intent to rob. Gordon, Lee, and Settles appeal from their convictions.

The following issues are raised on appeal: (1) Did the trial judge's excuse of a potential juror, who was black, deprive the defendants, who are also black, of their rights to a jury drawn from a fair cross section of the community and to a fair trial? (2) Prior to empanelling the jury, the judge examined the venire pursuant to G. L. c. 234, § 28 (1994 ed.). She asked the venire, as a group, questions concerning their understanding of the Commonwealth's burden of proof. On the fourth day of jury selection, however, after fifteen jurors had been seated, a member of the venire told the judge during individual voir dire that he and others had experienced difficulty hearing what she had said to the venire as a group. Gordon then moved for a mistrial on the ground that some or all of the fifteen seated jurors might not have heard the judge's questions to the jury as a group. We shall discuss whether the judge's denial of that motion was erroneous.

(3) On the first morning of jury selection, after one hundred venire members had entered the courtroom, the judge over objection excluded the public, including members of the defendants' families, from the courtroom due to lack of available seating. The judge then considered requests of jurors to be excused from service because of hardship. The issue is whether the judge interfered with the defendants' rights to a public trial when she excluded members of their families from the courtroom during the hardship colloquies. (4) Originally, Lazell Cook was a codefendant with Ricardo Parks, Gordon, Lee, and Settles. See *Commonwealth* v. *Cook*, 419 Mass. 192, 195 (1994). Before trial Gordon moved unsuccessfully for severance. Cook's attorney told the jury in his opening statement that there would be evidence that Gordon stabbed McKie and Carrion and later admitted that he had done so. Then, relying substantially on *Commonwealth* v. *Moran*, 387 Mass. 644 (1982), Gordon renewed his motion for severance. The judge denied that motion. We must decide whether that ruling was correct. (5) The fifth issue is whether the judge erred by denying Gordon's motion for a mistrial following her mid-trial allowance of Cook's motion for severance. (6) Did the prosecutor engage in such prosecutorial misconduct by improperly appealing to the jury's sympathy in his opening statement, presentation of evidence, and closing argument, that the defendants were denied a fair trial? (7) Did the judge reversibly err by allowing the Commonwealth to introduce in evidence a videotape recording of the defendants' booking at the police station? (8) Did the testimony of the Commonwealth's witness, Kevin Rollins, who was a party to a nonprosecution agreement, deprive the defendants of their rights to a fair trial? (9) Did the judge err in allowing the Commonwealth to introduce expert testimony regarding blood splatter analysis? (10) Did the judge err in allowing the Commonwealth's expert witness to testify to her opinion that ortho-tolidine tests conclusively indicated the presence of blood on the defendants? (11) Was the defendant Settles denied a fair trial when a witness identified him for the first time in the jury's presence? (12) Did the judge commit reversible error when she refused to allow the defendants to attend the jury view? (13) Did the evidence warrant a finding that the defendant Lee was guilty of the felony-murder of Rigoberto Carrion? (14) Did the judge err when she refused

to instruct the jury concerning the possibility of Lee's having been the receiver of stolen property? (15) Did the judge commit reversible error as to the defendant Settles when she instructed the jury on consciousness of guilt without limiting the instruction to the other defendants? (16) Should this court reverse or reduce the murder convictions of the defendants Gordon and Lee or either conviction pursuant to G. L. c. 278, § 33E (1994 ed.)?

We recite facts that the jury would have been warranted in finding. Later, in conjunction with specific issues, we shall discuss other facts that the jury properly could have found. On January 24, 1990, Settles drove his friend, Kevin Rollins, to a liquor store. While Settles waited in the van, Rollins went into the store to make a purchase. When he emerged, Rollins found that his friends, Gordon, Cook, and Parks, had also arrived at the store. The three men introduced Rollins to a fourth man, Lee. Rollins invited Settles and the others to his apartment to drink. While at the apartment, Cook and Gordon displayed knives. They "flicked" them in front of the others.

The group left Rollins' apartment approximately one hour after arriving there. Settles drove the others to several locations. Lee suggested that they go "to the projects" so they could "rob some drug dealers." Gordon, Cook, and Parks agreed. Rollins and Settles did not agree. When they arrived at the Newtowne Court housing project (Newtowne Court) by way of Lee's direction, the group disembarked from the van and entered the courtyard. The entire group entered the courtyard except Settles, who walked along the street outside the courtyard's entranceway.

Later, Tracy Williams, Jesse McKie, and Rigoberto Carrion walked along the street in front of the Newtowne Court entranceway. Gordon, Cook, Parks, and Lee confronted them and pulled McKie into the entranceway. The group surrounded McKie and demanded the leather jacket that he was wearing. At first, McKie resisted and tried to keep his coat on while the group tried to pull it off him. Suddenly, Gordon ordered, "Get him." Gordon, Cook, Parks, and Lee beat McKie and attempted to wrestle off his coat. McKie soon succumbed and pleaded with the group to take his jacket and leave him alone. They did not relent. As they continued to beat McKie, Gordon pulled out a knife and stabbed him with

a double thrust to his chest, puncturing McKie's heart. McKie cried for help. Williams left to get the police. Lee put on McKie's bloodied jacket. The group then threw McKie onto a snow bank and kicked and punched him repeatedly as he lay there. McKie died within a few minutes.

Carrion had seen the entire incident from the street outside Newtowne Court's entranceway. When Carrion turned to walk away, Gordon, Parks, Lee, and Cook pursued him. When they caught up with Carrion, they pushed him into a chain link fence and beat him. As they did so, Gordon stabbed Carrion. As Carrion struggled to get free, several members of the group kicked him. Carrion collapsed a few blocks away and died less than a week later.

Soon after the stabbings, the police pursued the suspects. They apprehended Parks and Lee and brought them to the police station. Later, Cook went to the station to bail Parks out. Cook told the police that he had come to the station with his two "buddies" who were waiting outside in a brown van. In the meanwhile, Williams, who had left the crime scene to obtain police help, identified Cook as one of the assailants. The police pursued the van, and apprehended Settles and Gordon a few blocks from the station after the van went the wrong way on a one-way street.

We shall discuss the issues in the order set forth above.

(1) *Excuse of a potential juror.* There were approximately 200 persons in the venire, only two of whom were black. The judge asked the venire present in the courtroom whether there was any reason why they could not sit on a six-week trial. One of the two black venire persons came forward and told the judge that she was divorced, was responsible for driving her son from Framingham to school in Weston every morning, was nervous about driving to court and therefore would need public transportation to court, "would be very stressed out" if she were on the jury, had high blood pressure and took "a lot of medicines for it to try to keep not too stressed out." General Laws c. 234A, § 40 (1994 ed.), provides: "In the event a trial is expected by the court to last more than three trial days, the trial judge shall announce this fact to jurors before the jury is impanelled. The trial judge may excuse a juror from performing his juror service on such an extended trial upon a finding of hardship, inconvenience, or public necessity taking into consideration the expected

length of the extended trial, but any juror so excused shall otherwise complete his term of juror service." See also G. L. c. 234, § 1A (1994 ed.) ("If at any time it appears that the public interest will be served by excusing any person from jury service, or if the performance thereof will impose undue hardship or unusual inconvenience upon any person, the judge presiding at the court or the clerk/magistrate of the court to which the juror has been called for service may excuse such person from jury duty"). In excusing the juror, the judge acted well within her "broad range of discretion in the jury selection process." *Commonwealth v. Barnoski*, 418 Mass. 523, 530 (1994). A defendant's right to a fair trial is not impaired by a potential juror's being excused from service in the circumstances presented by the excused juror in this case. Indeed, insistence on a juror's service in such circumstances presents a risk of unfairness not only to the juror but also to the Commonwealth and the defendants.

(2) *Motion for mistrial based on possibility that some members of venire might not have heard judge's questions pursuant to G. L. c. 234, § 28.* As required by G. L. c. 234, § 28, the judge posed questions to the venire as a whole that were "designed to learn whether such juror[s] understand[ ] that a defendant is presumed innocent until proven guilty, that the [C]ommonwealth has the burden of proving guilt beyond a reasonable doubt, and that the defendant need not present evidence in his behalf." No response was forthcoming. Several days later, as set forth above in our recitation of the issues on appeal, a member of the venire indicated that some members of the venire had not fully heard everything that the judge had said to the venire as a body and so may not have heard the G. L. c. 234, § 28, questions. The judge offered to repeat the questions to the jury after empanellment was completed. The defendant Gordon moved for a mistrial, which was denied.

The judge's refusal to grant a mistrial was appropriate. No statutory violation had been shown, and the judge's offer was well calculated to assure that the legislative objective was met. Two days later, in her opening instructions to the empanelled jury, the judge paraphrased three principles of § 28: "a defendant is presumed innocent until proven guilty . . . the Commonwealth has the burden of proving guilt beyond a reasonable doubt, and . . . the defendant need not present ev-

idence in his behalf." Although the judge did not pose these principles in a question format, none of the defendants objected. We are satisfied, as defense counsel appear to have been, that the jury understood and accepted the three burden of proof principles. The legislative objective, therefore, was achieved.

(3) *Were the defendants' rights to a public trial violated by the judge's exclusion of the public, including members of the defendants' families, from the courtroom during colloquies between the judge and prospective jurors seeking to be excused from service due to hardship or inconvenience?* The courtroom was open to the public during the remainder of the proceedings, including individual voir dire of each prospective juror. The right to public trial is extended to both the defendant and the public in a criminal proceeding. *Commonwealth* v. *Martin,* 417 Mass. 187, 192 (1994). *Commonwealth* v. *Marshall,* 356 Mass. 432, 435 (1969). The First Amendment to the United States Constitution secures the public's right of access to criminal trials, while the Sixth Amendment to the United States Constitution secures the defendant's right to a public trial. *Commonwealth* v. *Martin, supra.* The guarantees of open public proceedings in criminal trials cover proceedings for the voir dire examination of potential jurors concerning their qualifications to serve. *Press-Enterprise Co.* v. *Superior Court,* 464 U.S. 501, 508-513 (1984). *Globe Newspaper Co.* v. *Commonwealth,* 407 Mass. 879, 884 (1990). However, we have never held, and we are aware of no case in which it has been held, that the right to public trial extends to proceedings designed solely to enable the judge to hear prospective jurors concerning their requests to be excused from service and to dispose of such requests.

Analogous Massachusetts case law makes clear that the right to public trial does not extend to proceedings to determine whether prospective jurors should be excused on account of undue hardship or unusual inconvenience. In *Commonwealth* v. *Barnoski, supra,* the defendant argued that "his right to be present at all critical stages of his trial, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, see *Commonwealth* v. *Angiulo,* 415 Mass. 502, 530 (1993), was violated when the trial judge excused a significant portion of the jury pool, for reasons of hardship,

outside the presence of the defendant and his counsel, and without a stenographic record." *Id.* at 528. In rejecting the defendant's contention, we held that "[t]he purely administrative determination whether a prospective juror was able to serve without undue hardship, for nearly one month, on a sequestered jury in a distant county, was not a 'critical stage.' " *Id.* at 531. In *Barnoski, supra* at 530-531, we called attention to the earlier cases of *Commonwealth* v. *McKay,* 363 Mass. 220, 223 (1973), and *Commonwealth* v. *French,* 357 Mass. 356, 400 (1970), judgment vacated as to death penalty sub nom. *Limone* v. *Massachusetts,* 408 U.S. 936 (1972), in which we held that a defendant does not have a constitutional right to be present at preliminary hardship colloquies of members of the jury pool. We distinguished those cases from *Commonwealth* v. *Owens,* 414 Mass. 595 (1993), in which we held that a defendant is entitled to be present when jurors are being individually examined. In *Barnoski, supra* at 531, we quoted from *Commonwealth* v. *Owens, supra* at 602, as follows: "A defendant has a right to be present when jurors are being examined in order to aid his counsel in the selection of jurors and in the exercise of his peremptory challenges." As those cases make clear, there is a critical distinction between hardship colloquies and individual examination of prospective jurors as to their qualifications to serve. We conclude that, just as hardship colloquies need not be conducted in the presence of the defendant and defense counsel, they also need not be open to the public.

(4) *Gordon's motions for severance.* Counsel for Lazell Cook, originally a codefendant with Gordon, Lee, Settles, and Parks, told the jury in his opening statement that the evidence would show that Gordon stabbed McKie and Carrion and that Gordon subsequently admitted to Cook he had done so. At the conclusion of the opening, relying primarily on *Commonwealth* v. *Moran,* 387 Mass. 644 (1982), Gordon renewed his earlier motion for severance which the judge had denied. The judge denied the renewed motion as well. There was no error.

In *Commonwealth* v. *Moran, supra,* two defendants appealed from convictions of murder in the first degree and unarmed robbery following a jury trial. We reversed the murder convictions because the judge had failed to instruct the jury that they must find conscious disregard of risk to human life

in order to apply the common law felony-murder rule. *Id.* at 651. We reversed the unarmed robbery conviction also, but on the ground that the defendants should have been tried separately. *Id.* at 660-661. *Moran* is significantly distinguishable from the present case. In *Moran*, there were only two defendants and there were no eyewitnesses to the alleged criminal conduct. It was clear that "at least one defendant, but not necessarily both of them, robbed and killed [the victim]. The only realistic escape for either defendant was to blame the other." *Id.* at 659. In concluding that severance of the trials of the two defendants was required, this court reasoned as follows:

> "Failure to sever in such circumstances has several unacceptable consequences. First, each codefendant's jeopardy invites his perjured testimony, to the detriment of the other codefendant. The Commonwealth's use of such testimony to obtain a conviction is fundamentally unfair and does not serve the public's interest in justice. Second, where there is convincing evidence that a crime has been committed by at least one of the defendants, a jury, disinclined for any reason to convict a particular defendant, may be inclined to find the other guilty. There is a danger that the jury will feel compelled to choose between defendants rather than to assess the proof against each defendant separately. Finally, with one defendant pitted against the other, there is a danger that the jury will unjustifiably infer from the conflicting defenses alone that both defendants are guilty. *Rhone* v. *United States*, 365 F.2d 980, 981 (D.C. Cir. 1966). Moran's and Chenail's defenses were mutually antagonistic and irreconcilable. The prejudice to each defendant was compelling. Tried together, neither defendant could have a fair trial. Severance was required." *Id.*

We distinguished a later case, *Commonwealth* v. *Sinnott*, 399 Mass. 863 (1987), from *Moran* in a way that is significant to the present case. We said, "In *Moran*, the assault was witnessed by no one but the defendants; and the prosecution's best evidence tends to prove 'that at least one defendant, but not necessarily both of them, robbed and killed [the victim].' [*Commonwealth* v. *Moran, supra* at 659]. By contrast, the prosecution here produced four eyewitnesses, each of whom

persisted under vigorous cross-examination in testifying that *both* defendants took active parts in battering [the victim] (emphasis in the original).

"The jury in this case were fully warranted in choosing to believe neither defendant and to credit the eyewitnesses instead. Where, as here, the jury enjoyed a highly probative option to rely on neither defendant's account, we cannot say that there was a substantial likelihood of a miscarriage of justice or that a joint trial denied the defendants a fair trial." *Id.* at 874-875. See *Commonwealth* v. *Cordeiro*, 401 Mass. 843, 853 (1988) ("More importantly, no matter how inconsistent or antagonistic the defenses or trial strategies of the two defendants, there is no compelling prejudice and therefore no requirement of severance where the jury were warranted in finding [the codefendant] guilty of the crime of aggravated rape on the basis of the eyewitness testimony of the bartender and [the codefendant's] own properly admitted confession").

The present case is not governed by *Moran*. Unlike the facts of *Moran,* when Gordon moved for severance and when he later renewed his motion, there were five defendants and three additional eyewitnesses to the commission of the crimes alleged. Three of the eyewitnesses identified Gordon as the killer of McKie and one eyewitness identified Gordon as the killer of Carrion. Each codefendant's jeopardy did not invite his perjured testimony that Gordon, rather than others, was the perpetrator. This is not a case similar to *Moran* in which Cook or any of Gordon's other codefendants could only avoid his own conviction by putting the blame specifically on Gordon. The judge properly denied Gordon's motions for severance.

(5) *Gordon's motion for mistrial.* During the testimony of a Cambridge detective, the judge allowed Cook's motion for a mistrial and severance. Gordon then moved for a mistrial as to him based on Cook's attorney's opening statement to the jury that there would be evidence that Gordon had stabbed McKie and Carrion and had admitted to Cook that he had done so. The mistrial and severance occurred before Cook had an opportunity to testify. Gordon's counsel, therefore, had no opportunity to cross-examine Cook. Counsel argued to the judge and argues now that without a declaration of mistrial as to Gordon, Gordon was irreparably prejudiced by the opening statement inculpating him which then became

unassailable, by cross-examination of Cook, as a result of Cook's departure from the case.

The judge correctly denied Gordon's motion for a mistrial. Such a motion rests within the sound discretion of the trial judge. *Commonwealth* v. *Chubbuck*, 384 Mass. 746, 753 (1981). As stated above, three eyewitnesses identified Gordon as McKie's killer and one identified him as the killer of Carrion. Furthermore, the judge repeatedly instructed the jury that an opening is not evidence on which the jury can rely in reaching their verdict. "[I]t must be presumed that in reaching the verdict, the jurors heeded the judge's instructions." *Commonwealth* v. *Fidler*, 377 Mass. 192, 199 (1979).

(6) *Prosecutor's alleged improper appeal to the jury's sympathy in his opening, presentation of evidence, and closing.* The defendants, having made proper objections at trial, argue that in his opening, in his presentation of witnesses, and in his closing argument, the prosecutor made a calculated effort to appeal to the jurors' sympathy for the victims, McKie and Carrion, and persons close to them that they left behind, and in doing so sought "to sweep [the] jurors beyond a fair and calm consideration of the evidence." *Commonwealth* v. *Graziano*, 368 Mass. 325, 332 (1975), quoting *Commonwealth* v. *Perry*, 254 Mass. 520, 531 (1926).

During his opening, the prosecutor said to the jury:

> "And you will learn, members of the jury, and there will be evidence in this case, that the Newtowne Court housing complex, like many other urban housing developments, was a place for people, especially young people, gathered in the courtyards, on the street corners at night, and on into the evening, looking for friends, looking for a familiar face, looking for something to do.

> "And you will learn, members of the jury, and there will be evidence in this case, that like in any other urban housing development, Newtowne Court had its share of problems with alcohol and its share of problems with drugs, and all of the various problems that come and are associated with drugs, and all of the problems that are associated with alcohol.

> "You will learn as well, members of the jury, within

that same housing project, in and about that community, people live, people work, people raise their families. And that evidence, members of the jury, will direct your attention as well to some two years ago, the month of January, 1990, to a time when Jesse McKie had just turned 21, and when Jesse McKie's world evolved around two things; his long time girlfriend, who at the time was seven months pregnant with his child —"

COUNSEL FOR THE DEFENDANT SETTLES: "Objection, your Honor."

THE PROSECUTOR: "— and his interest and his love —"

COUNSEL FOR THE DEFENDANT LEE: "Objection, Judge."

THE PROSECUTOR: "— and his work —"

THE JUDGE: "Overruled."

COUNSEL FOR THE DEFENDANT COOK: "I join, your Honor."

THE PROSECUTOR: "— of popular music. And that evidence will direct your attention to a time when Rigoberto Carrion had just separated from his wife and his young twin sons, and had returned to that community, to that environment at the Newtowne Court housing complex where he and his 15 brothers and sisters had all been raised, to a time, members of the jury when Jesse McKie and Rigoberto Carrion often, perhaps too often, found themselves among those groups of young people, feeling comfortable on the streets and in the courtyards of Newtowne Court.

"You will learn, members of the jury, about Jesse McKie and about Rigoberto Carrion, about who they were, where they lived. What kind of lifestyle they led is of secondary importance. Because what is important is that Jesse McKie and Rigoberto Carrion are no more."

COUNSEL FOR THE DEFENDANT SETTLES: "Objection."

THE PROSECUTOR: "And they are no more, members of
the jury, because they were murdered, murdered in cold
blood, by the Defendants; Ventry Gordon, Sean Lee,
Ricardo Parks, and Lazell Cook, four complete and total
strangers. Jesse McKie, Rigoberto Carrion, somebody,
anybody."

Three of the Commonwealth's first four witnesses were
family members or friends of the victims. Daryl Dottin testi-
fied that she was McKie's girl friend and the mother of his
daughter who was born a few months after his death. She
also testified that on the day of the murder she had met Mc-
Kie for lunch, at which time they had a disagreement, and
she called him later that afternoon and he was upset.

McKie's father, Todd McKie, testified that the victim Mc-
Kie lived with him and his wife. He identified two articles,
which were on McKie's person on the night of his death, as
gifts to his son from him. The witness further testified that on
the day of the killing, the witness returned home from work
at 5:30 P.M. and saw McKie leave wearing a leather jacket
which the witness identified for the jury.

Milagros Carrion, the sister of Rigoberto Carrion, testified
that her brother was living with her in January, 1990, and
that he had recently left his girl friend by whom he had
fathered twins. The witness identified clothes in court as
clothes Rigoberto Carrion had worn on the night he was at-
tacked.

In closing argument, the prosecutor said:

"You've seen and heard from some forty witnesses, and
over one hundred and twenty physical exhibits have
been introduced into evidence. . . . But, when all is said
and done, members of the jury, I suggest to you, that
you need only look at the testimony of two witnesses,
and you need only look, members of the jury, at two
individuals who never came through that door, who
never took that witness stand, who never told you but a
single word, to know what it was that happened on the
morning of January 25, 1990, in Newtowne Court.
Because the body of Jesse McKie, and the body of
Rigoberto Carrion is the best evidence you have in this
case. The body of Rigoberto Carrion, and the body of

Jesse McKie cannot be intimidated. [They] cannot be confused. [They] cannot be misled. Jesse McKie's body, and Rigoberto Carrion's body speak for themselves loud and clear."

With respect to the prosecutor's opening, the defendants especially focus on what they contend was the prosecutor's reference to McKie's "long time girlfriend, who at the time was seven months pregnant with his child," and to the prosecutor's reference to Carrion's recent separation from "his wife and his young twin sons," as well as the reference to Carrion's surviving "fifteen brothers and sisters." In reference to the Commonwealth's witnesses, Dottin, Todd McKie, and Milagros Carrion, the defendants' position is that the prosecutor's decision to present those witnesses was a "calculated impropriety" because it was designed for the dominant, if not sole, purpose of creating juror sympathy rather than proving the crimes charged in the indictments. See *Commonwealth* v. *Harris,* 409 Mass. 461, 468-469 (1991); *Commonwealth* v. *Andrews,* 403 Mass. 441, 450-451 (1988). Similarly, the thrust of the defendants' argument here regarding the prosecutor's closing argument to the jury is that, at least in part, the closing argument was designed to play on the jury's emotions rather than assist them in a considered determination as to guilt or innocence.

We conclude that there was no reversible prosecutorial error in the prosecutor's opening, presentation of the evidence discussed immediately above, or closing argument. We shall set forth our reasoning in that regard, but before doing so we acknowledge that the defendants have expressed appropriate concerns; concerns not lightly to be dismissed. It is proper to inquire how the truth-finding effort was promoted by the prosecutor's reference in his opening to McKie's "long time girlfriend" and mother of his child, and to Carrion's wife, young sons, and brothers and sisters, none of whom played a role in the events being inquired into. In addition, although it was marginally appropriate to establish the identity of the victims by testimony concerning the ownership of the clothing they wore, see *Commonwealth* v. *Benoit,* 389 Mass. 411, 425 (1983), it is difficult to recognize the relevancy of Daryl Dottin's testimony concerning her motherhood of McKie's child and McKie's being "upset" on the afternoon before he

was killed. We urge caution in admitting evidence in criminal cases that appears to be more related to evoking sympathy then to proving the elements of the alleged crime or crimes.

We conclude that there was no reversible error in connection with the prosecutor's opening, presentation of the testimony of Dottin, Todd McKie, and Milagros Carrion, and the prosecutor's argument to the jury, because we are satisfied that the defendants were not prejudiced by any such prosecutorial misconduct. We begin with the fact, as we see it, that, standing alone, the sympathetic value or emotional appeal of the prosecutor's opening and final argument and the described testimony could not have added much to the traumatic fact that two young men had died as a result of an unprovoked attack. In addition, the judge explicitly instructed the jury that they should not base their decision on any sympathy they might have had for the victims, thus mitigating any potential inappropriate impact of the prosecutor's statements and the challenged testimony. *Commonwealth* v. *Benoit, supra.* Indeed, the acquittal of Parks and the conviction of Settles on only one of three indictments tends to show that the jury were able to, and did, comply with the aforementioned instruction from the judge.

Lastly, Lee's counsel, Mr. Cunha, said in his closing argument that "the medical examiner said . . . those scraping injuries . . . are consistent with somebody scraping themselves along the street. . . . Was [Carrion] crawling at that point?" In response, the prosecutor retorted in his closing argument, "Mr. Cunha would have you believe [Carrion] was slinking along the ground, on his rear end. Shame on Mr. Cunha." With respect to the prosecutor's statement focused on Mr. Cunha, the judge instructed the jury as follows: "Mr. Cunha was performing in the highest tradition when he pointed out [an] alternative theory for particular evidence. It was improper argument for [the prosecutor] to imply otherwise and you're to strike that remark from your mind and disregard it." "On numerous occasions, the impact of an improper final argument has been mitigated by the judge's forceful instructions to the jury that the argument was inappropriate and should be disregarded." *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 (1987).

We are satisfied that, with respect to issue number 6 herein, there has been no prejudicial error.

(7) *Admissibility of videotape of defendants' booking at the police station.* We conclude that the judge properly admitted the tape recording, the video and audio aspects of which were relevant to the defendants' state of intoxication or sobriety when the alleged assaults of McKie and Carrion took place. The defendants argue that the making of the tape was unlawful by virtue of G. L. c. 272, § 99 (1994 ed.), and that suppression was mandated by G. L. c. 272, § 99 P. We disagree.

General Laws c. 272, § 99 A, entitled "Preamble," states that "the increasing activities of organized crime constitute a grave danger to the public welfare and safety," that "[n]ormal investigative procedures are not effective in the investigation of illegal acts committed by organized crime" and that "[t]herefore, law enforcement officials must be permitted to use modern methods of electronic surveillance, under strict judicial supervision, when investigating these organized criminal activities." Section 99's preamble then states: "The general court further finds that the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the commonwealth. Therefore, the secret use of such devices by law enforcement officials must be conducted under strict judicial supervision and should be limited to the investigation of organized crime."

General Laws c. 272, § 99 B 4, provides in pertinent part that "[t]he term 'interception' means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication . . . ." Section 99 C 1, provides: "Except as otherwise specifically provided in this section any person who—willfully commits an interception, attempts to commit an interception, or procures any other person to commit an interception or to attempt to commit an interception of any wire or oral communication shall be fined not more than ten thousand dollars, or imprisoned in the state prison for not more than five years, or imprisoned in a jail or house of correction for not more than two and one half years, or both so fined and given one such imprisonment." Although G. L. c. 272, §§ 99 B 4 and 99 C 1, can be read literally as making unlawful the audiotaping of booking procedures without the knowledge of the

persons being booked, and as subjecting the responsible police officers to severe penalties therefor, in the absence of more specific statutory language to that effect and in light of the preamble, we are unwilling to attribute that intention to the Legislature. It is apparent from the preamble that the legislative focus was on the protection of privacy rights and the deterrence of interference therewith by law enforcement officers' surreptitious eavesdropping as an investigative tool. It is in that context that the Legislature limited police use of electronic surveillance (investigative) devices to the investigation of organized crime "under strict judicial supervision." The Legislature does not appear to have had in mind the recording of purely administrative bookings steps following an individual's arrest. In this regard, the videotape did not capture or reveal the defendants' thoughts or knowledge about some fact or subject, but at best served only to exhibit the defendants' bearing and manner of speaking which were relevant on the question of their intoxication or sobriety at the time of the assaults. See *Commonwealth v. Mahoney*, 400 Mass. 524, 528 (1987).

(8) *Did testimony of party to nonprosecution agreement deprive defendants of fair trial?* The defendants challenge the judge's decision, over their objection, to admit in evidence the testimony of Kevin Rollins, who had entered into a nonprosecution agreement with the Commonwealth. The agreement provided:

> "You have stated to [an] Assistant District Attorney that you were present at, and have direct knowledge of, the robbery and stabbing of Jesse McKie and the stabbing of Rigoberto Carrion, both events occurring in Cambridge on January 25, 1990. You have represented to [the assistant district attorney] that you did not participate in the robbery and/or stabbing of Mr. McKie or in the stabbing of Mr. Carrion.
>
> "In return for your complete and truthful cooperation, including testimony at any and all grand jury, pretrial and/or trial proceedings, the Commonwealth of Massachusetts, District Attorney for Middlesex County, hereby represents that no criminal proceedings will be initiated or prosecuted against you for your activities on

the night of January 24-25, 1990. This promise is expressly conditioned on your representation that you did not participate in either stabbing mentioned above and on your complete and truthful cooperation with the Commonwealth."

Although it is generally accepted that "testimony pursuant to a plea agreement, founded on a promise of truthful cooperation" is admissible, *Commonwealth* v. *Ciampa*, 406 Mass. 257, 261 (1989), the defendants contend that this particular agreement compelled Rollins to falsify his testimony thereby depriving them of their right to a fair trial. The defendants maintain that the "cooperative aspect [of the non-prosecution agreement] overrode the 'truthful' aspect [of the agreement]." In particular, they assert that Rollins, in order to fulfil his obligation to "truthfully cooperate" with the Commonwealth, was required to comport with a particular factual scenario that the Commonwealth had envisioned, thus creating too great an inducement to lie.

We disagree. The agreement does not say that the Commonwealth's performance is contingent on Rollins' testimony conforming to the Commonwealth's version of the events. Rather, the Commonwealth's commitment is conditioned on Rollins' noninvolvement in the two killings and his "truthful cooperation" with the Commonwealth. Such an agreement does not present the same "inducement to lie" as would an agreement which conditioned the nonprosecution agreement on a conviction. Compare *Commonwealth* v. *Colon*, 408 Mass. 419, 443 (1990) (no error in admitting nonprosecution witness's testimony where her nonprosecution agreement permitted dismissal of charges against her if she testified *"in accordance with the aforementioned statements"* contained within the agreement [emphasis in original]) with *Commonwealth* v. *Ciampa, supra* at 261-262 n.5 ("[t]estimony pursuant to a plea agreement made contingent on obtaining . . . a conviction, as a result of the witness's testimony, would presumably present too great an inducement to lie, [and] would not meet the test of fundamental fairness . . .").

Moreover, Rollins did not fully harmonize his testimony with the Commonwealth's version of events. Although the agreement stated that Rollins had observed the killing of Carrion, he did not testify to that at the trial. Furthermore, the

inherent infirmities of a witness's testifying pursuant to a nonprosecution agreement were fully explored at the trial. "The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." *Commonwealth* v. *Colon, supra* at 443, quoting *Hoffa* v. *United States,* 385 U.S. 293, 311 (1966), reh'g denied, 386 U.S. 940 (1967). During vigorous cross-examination, defense counsel confronted Rollins concerning his status as a witness testifying pursuant to a nonprosecution agreement. In addition, in closing argument defense counsel attacked Rollins' veracity by characterizing him as an accomplice who perjured himself to preserve his entitlements under the agreement. Finally, in her general instructions, the judge instructed the jury concerning witness motive and bias generally and then instructed them specifically with respect to the various factors that would be appropriately considered in assessing Rollins' testimony including the possibility of his having been an accomplice, his possible interest in the outcome of the case, and his motive to testify pursuant to the nonprosecution agreement. She instructed the jury that any testimony pursuant to such an agreement "must be considered and weighed with greater caution and care than the testimony of an ordinary witness." Admission of Rollins' testimony pursuant to the nonprosecution agreement was proper.

(9) *Admissibility of expert testimony interpreting blood splatter.* The defendants Lee and Gordon argue that the Commonwealth's failure to comply with discovery obligations as well as its destruction of potentially exculpatory evidence culminated in a violation of their right to a fair trial.

The Commonwealth and the defendants had entered into a pretrial discovery agreement which required "each party [to] notify the other of proposed expert testimony to be offered at trial or evidentiary hearings." During the direct testimony of the Commonwealth's forensic serologist, Karolyn M. Leclaire, the witness testified that certain blood splatters found on the defendants' clothing were consistent with the defendant Gordon's role as the stabber and the defendant Lee's role as being located nearby the victims during the stabbing and as kicking one of the victims after the stabbing. She based her opinion on her observations of the various configurations of blood

splatters, including the form, shape and "directionality" of the bloodstains on the defendants' clothing. The defendants objected to Leclaire's testimony that the blood splatter evidence indicated that they had had principal roles in the stabbings, claiming that they had not received notice, as required by the discovery agreement, that the Commonwealth's witness would testify in that regard. The only evidence the Commonwealth supplied to the defendants before trial concerning Leclaire's expected testimony consisted of three reports detailing blood-type testing which had been conducted on various articles of clothing. The judge determined that those reports did not comply with the discovery order because they did not give any indication of a "directionality" analysis. The judge denied the defendants' motions for mistrial and dismissal, however, and instead granted the defendants time to locate an expert witness to counter the Commonwealth's expert's testimony. This was in accord with the Appeals Court's decision in *Commonwealth* v. *McGann*, 20 Mass. App. Ct. 59, 66 (1985) ("When undisclosed evidence surfaces at trial, unless it is virtually destructive of the defendant's case . . . the preferred course of action is . . . a provision of additional time for investigative efforts, rather than declaration of a mistrial. *Commonwealth* v. *Baldwin*, 385 Mass. 165, 176-177 [1982]"). The defendants, however, argue that the judge's remedy was ineffective because the Commonwealth had destroyed the evidence on which its expert relied thereby precluding a defense expert from forming an opinion.

It is true, as the defendants say, that the Commonwealth had destroyed the evidence on which its expert relied. It is important to understand, however, that this was not the result of malicious intent or negligence on the Commonwealth's part. The evidence was consumed in the process of testing the blood stains. Although the Commonwealth drew sketches of the blood stains, it did not photograph the process. However, being aware of the possibility that the evidence would be destroyed, the Commonwealth notified the defendants of that fact and informed them they were welcome to have their expert witnesses observe the testing procedure. The defendants declined to do so. Although we have indicated that, when the Commonwealth performs testing that would exhaust the evidence, "the better practice would [involve] careful documentation and photographing of the entire test," *Commonwealth* v.

*Shipps,* 399 Mass. 820, 836 (1987), and cases cited, the Commonwealth's failure to photograph in this case has minimal significance.

The critical question is whether the defendants were unfairly prejudiced by the Commonwealth's failure to notify the defendants in advance of trial that the Commonwealth would offer expert opinion testimony that the blood splatter evidence was consistent with Gordon and Lee's guilt as charged. We conclude that, if the defendants had been told before trial of Leclaire's expected testimony, the defendants' situation would have been no better than it turned out to be. Even if the Commonwealth had not violated the discovery order, the defendants would have needed to consult with and prepare an expert without the benefit of the destroyed blood samples; that is, with the same material the Commonwealth obtained after Leclaire testified. Defense counsel not only mounted an effective cross-examination of Leclaire, but challenged her opinion through the testimony of their own expert, Stuart James. James testified that the size and quantity of the blood stains were too little to suggest definitively that they were consistent with a medium-velocity blow; that the blood stains may not have resulted from a blow at all; that Leclaire did not follow proper procedure among blood splatter experts in that she did not photograph her procedure; that the amount of blood stain available to Leclaire would not have sufficed for an accurate conclusion as to the "specific activity that was required to produce [the] stains"; and that he was unable to distinguish the directionality of the blood splatter because of the minute size of the blood stains and because they were not preserved by photographs. The judge's grant to the defendants of time to locate an expert witness effectively counteracted any prejudice possibly flowing from the Commonwealth's violation of the discovery order. See *Commonwealth* v. *Baldwin,* 385 Mass. 165, 176-177 (1982), quoting *Commonwealth* v. *Cundriff,* 382 Mass. 137, 150 (1980), cert. denied, 451 U.S. 973 (1981) ("unless the undisclosed evidence is . . . virtually destructive of the defendant's case . . . 'additional time for investigative purposes'" is the appropriate remedy).

(10) *Admissibility of expert testimony that ortho-tolidine tests were "conclusive" for the presence of blood on the defendants.* The defendants challenge the judge's decision to permit Patricia Forti, a chemist with the Department of Pub-

lic Safety crime laboratory, to testify that ortho-tolidine testing is "indicative and conclusive" of the presence of blood. They contend that, while it is generally accepted within the scientific community that a positive ortho-tolidine test is consistent with the presence of hemoglobin, "there is a virtual uniform rejection of the theory that such testing is specific for blood."

At the time of this trial, if a party wished to introduce expert testimony concerning scientific theory or principles, the trial judge was required to determine "whether the community of scientists involved generally accepts the theory or process. *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923)." *Commonwealth* v. *Curnin*, 409 Mass. 218, 222 (1991). See *Commonwealth* v. *Fatalo*, 346 Mass. 266, 269 (1963). Although we have since modified the applicable standard by which trial judges are to determine the admissibility of evidence based on scientific theory or instruments in *Commonwealth* v. *Lanigan*, 419 Mass. 15 (1994), we need not address whether *Lanigan* applies retroactively to the instant case because, as discussed, *infra,* the expert testimony satisfied the "general acceptance in the scientific community standard" which may be regarded as a somewhat more stringent standard for admissibility than the standard enunciated in *Lanigan, supra* at 26 ("a proponent of scientific opinion evidence may demonstrate the reliability or validity of the underlying scientific theory or process by some other means, that is, without establishing general acceptance").

We conclude that, although Forti testified that a positive ortho-tolidine test result is "indicative and conclusive" of the presence of blood, it is clear from reading her testimony in its entirety that she did not intend, as the defendants assert, her statement to connote that the test was specific for the presence of blood. According to her testimony, Forti performed the ortho-tolidine test on each of the defendants' hands to determine whether occult blood was present. Occult blood is not visible to the naked eye but can be detected chemically. The ortho-tolidine procedure tests for the presence of hemoglobin, which is the iron-containing protein pigment occurring in the red blood cells of vertebrates. Webster's Third New Int'l Dictionary 1055 (1993). Thus, the test is sensitive to the presence of iron.

Forti explained the two-step ortho-tolidine procedure. Af-

ter rubbing a piece of filter paper on the subject's skin, where the occult blood is believed to be present, ortho-tolidine is added to the paper. A peroxide, in this case sodium perborate, is then added to the paper. If the paper changes color to a bright blue, the ortho-tolidine test has returned a positive result. A positive test result, Forti testified, would "conclude the presence of blood, or indicative of blood." She further testified that she performed the two-step ortho-tolidine test on Settles, Lee, and Parks and that each defendant tested positive. A positive result, she reiterated, was "indicative and conclusive of the presence of blood."

Forti testified that, upon obtaining a positive test result, and if there were any remains of the sample, she would then perform a species test, called a precipitin test, to determine whether the blood is human or animal. If, however, the test was performed on occult blood as it was here, the sample is exhausted in the ortho-tolidine test procedure, and a species test cannot be performed. Thus, in the instant case Forti was unable to perform the precipitin test on the defendants' samples.

Forti further testified that the ortho-tolidine test is a presumptive rather than a specific test. A specific test, she agreed, tests for only one particular substance and therefore, a positive result would mean that that particular substance is present. On the other hand, a positive test result from the ortho-tolidine procedure, which is a presumptive test, means that the result is consistent with the presence of blood but it is also consistent with the presence of other substances. On cross-examination, Forti specifically agreed to the statement that "a positive test alone should not be interpreted as positive evidence of blood . . . [b]ecause there could be other materials which can give a positive test . . . ."

Because the ortho-tolidine test is merely presumptive, it has the capability of producing false positives. False positives occur, she testified, because iron, the element that triggers a positive oxidation reaction in the ortho-tolidine test, is present in hemoglobin, or blood cells, but is also present in numerous other substances. Thus, a positive result could indicate a substance which contains iron but is not human blood. Forti named various items which contain iron that could trigger a false positive in the ortho-tolidine test: rust, copper or nickel salts, some bleaches, iodine, raw meat, raw potatoes, raw tomatoes, and raw onions.

Forti testified that to control false positives, certain measures are taken to secure the accuracy of the test. She testified that the two-step ortho-tolidine testing procedure she followed is generally accepted in the scientific community, and she explained how it helps to eliminate a false positive result. After the first step in the procedure, in which Forti adds the ortho-tolidine to the filter paper, if the paper changes color once the chemical is added, the substance on the paper is determined to be a chemical oxidant, such as rust, and not blood, and is therefore excluded as a positive result. If the paper does not change color the sodium perborate is added. If the paper then does change color, Forti testified, "[I]t's indicative of blood." The two-step procedure, she said, does not eliminate "plant peroxidases" and does not specify whether the blood is human or animal.

When considering Forti's testimony in its entirety, it is clear that she did not state that the ortho-tolidine test was specific for blood. To the contrary, she explicitly testified that the test was merely presumptive, and conceded that there were other substances, such as raw animal meat or raw vegetables, that could have triggered the positive result. She further conceded that "a positive test alone should not be interpreted as positive evidence of blood . . . [b]ecause there could be other materials which can give a positive test." As the defendants themselves concede, it is generally accepted within the scientific community that a positive ortho-tolidine test result is consistent with, but not specific for, the presence of blood. There was no error in admitting Forti's testimony.

In addition, Forti testified that, although the ortho-tolidine testing procedure was merely presumptive, and not specific, for the presence of blood, in her opinion, the positive test results indicated that each of the defendants had come into contact either directly with blood or with an object which had blood on it. Forti based her opinion on comparisons of color changes which she had observed, over the past eight years, while performing the ortho-tolidine test on various samples. She asserted that when blood was present on the filter paper she observed the paper change to a brilliant blue color. On the other hand, if any other type of iron-containing substance was present on the filter paper, the ortho-tolidine test would turn the paper to different shades of blue. Based on these observations, she concluded that if the color did not

turn to a brilliant blue the possibility existed for a false posi-
tive, or in other words, a substance other than blood.

Forti's opinion that the positive test results, as it pertained
to the defendants, indicated the presence of blood rather than
some other iron-containing substance was properly admitted.
It was not subject to *Frye*'s general acceptance in the scien-
tific community standard. *Frye* is inapplicable where the wit-
ness testimony is based on personal observations rather than
dependent on scientific theories or principles. We first began
to define the limits of *Frye* in *Commonwealth v. Devlin*, 365
Mass. 149 (1974). In *Devlin*, the victim's body was unidentifi-
able because it was badly decomposed and mutilated. *Id.* at
150. In order to identify the victim, the Commonwealth of-
fered the testimony of a doctor who testified that in his
opinion, X-rays taken of the torso of a living man (antemor-
tem) at Boston City Hospital two years prior to the discovery
of the body matched the postmortem X-rays of the torso of
the mutilated body. *Id.* at 152. Based on his own observations
over many years, he testified that every individual has a
unique bone structure, and that because the two sets of X-rays
(antemortem and postmortem X-rays), were identical the
murder victim was the man whose torso had been X-rayed.
We upheld the trial judge's admission of the testimony. Al-
though the defendant in *Devlin* asserted that the expert's
opinion was based on a scientific theory that had not received
general acceptance in the scientific community, in contraven-
tion of *Frye*, we determined that the *Frye* standard was inap-
plicable. *Id.* at 154-155. We noted that "the use and reading
of X-rays and the comparison of X-rays is a generally
recognized medical practice." *Id.* at 155. We reasoned then,
that the expert's opinion was not based on a scientific theory
or scientific instrument, but, rather "the product of years of
experience viewing tens of thousands of X-rays." *Id.* We have
not wavered from this limitation on *Frye*: that opinions based
on personal observations of scientific procedures, which are
themselves generally accepted in the scientific community, are
not governed by *Frye*. See *Commonwealth v. Ghee*, 414 Mass.
313, 320 (1993) (expert permitted to testify concerning his
opinion that die lines in plastic bags found in defendant's
home matched the plastic bag containing the victim's body
because based on observations of scientific procedures which
were generally accepted within scientific community); *Com-*

*monwealth* v. *Cifizzari*, 397 Mass. 560, 570-571 (1986) (expert permitted to testify concerning bite mark analysis because opinion based on observations of scientific instruments, X-rays, models and photographs, which were generally accepted in scientific community). See also *Commonwealth* v. *Beausoleil*, 397 Mass. 206, 215 n.11 (1986) (stating this court has not "utilized the *Frye* test to preclude the admissibility of novel scientific techniques or information developed by a particular expert witness utilizing accepted scientific instruments or theories").

Similarly, in the instant case, Forti's opinion testimony was the product of eight years' experience observing the color changes during the oxidation process in the ortho-tolidine test. The ortho-tolidine procedure is generally accepted in the scientific community to test for the presence of blood. She consistently maintained that a positive ortho-tolidine test is generally accepted in the scientific community to be considered consistent with the presence of blood, among other iron-containing substances. Forti never testified that a positive ortho-tolidine test result was specific for the presence of blood. Therefore, in the instant case, Forti's opinion testimony that she could decipher, due to her own observations, false positive test results by the color of the oxidation reaction was not subject to *Frye*. Her testimony was properly admitted.

(11) *Did witness Taylor's identification of Settles before the jury deprive Settles of a fair trial?* Substantially in advance of trial Settles filed the following "Motion to Prevent Unfair Identification Procedures":

> "NOW COMES the defendant and respectfully moves this Honorable Court to order the Commonwealth to refrain from conducting any show up, photographic identification procedure or other unfair identification procedure with any eyewitness who has not yet been asked to identify the defendant.

> "The defendant requests that this Court order the Commonwealth to conduct a non-suggestive line-up procedure with each eyewitness to the defendant's alleged involvement (if the Commonwealth intends to rely on that witness at trial). The defendant hereby agrees to participate in any such court ordered line-up.

"In support of his motion the defendant says that it is error of constitutional magnitude to permit a prosecutor to conduct unfair and suggestive identification procedures. See *Commonwealth* v. *Marini*, 375 Mass. 510, 516 (1978)."

Shortly before the trial, Settles brought this motion to the attention of the judge. On that occasion, the judge told the prosecutor that Settles feared that someone who had not previously identified him would do so for the first time on the witness stand. The prosecutor responded that he did not know of any such witness. The judge denied Settles' request for a line-up for any such witness.

During the trial, a Commonwealth's witness, Earle Taylor, identified Settles, who was seated at a table in the courtroom with the other defendants, as one of the individuals he had seen at the scene of the assaults. Taylor had previously been shown a photographic array that included Settles' photograph, but failed to identify him. On direct examination, Taylor identified Gordon, Rollins, Cook, and Lee. When asked by the prosecutor whether, in January of 1990, he knew Ricardo Parks or Ronald Settles, Taylor answered that he did not know them. Taylor then testified as follows:

*Q.*: "As you were walking up School Street towards the entranceway to Newtowne Court early that Thursday morning, whether or not you saw anybody that you recognized?"

*A.*: "Yes."

*Q.*: "Who did you see?"

*A.*: "I seen Ventry, I seen Kevin Rollins, and I seen Lazell — I seen everybody."

*Q.*: "When you say everybody, who —"

*A.*: "The group that they was with."

*Q.*: "— strike that. Do you see any of the people that you saw that morning as you walked up School Street towards Newtowne Court in the courtroom today?"

*A.*: "Yeah, they all's there."

*Q.:* "When you say all, could you just, for the record, indicate slowly which individuals you saw when you first started walking up School Street?"

*A.:* "Every individual I see in front of me."

*Q.:* "Well, for the record, did you see this individual?"

*A.:* "Yeah."

THE PROSECUTOR: "Would the record reflect I'm pointing to the Defendant, Ventry Gordon?"

COUNSEL FOR THE DEFENDANT LEE: "I object."

THE JUDGE: "You may have it."

*Q.:* "Did you see the second individual who you've referred to as Sean Lee?"

*A.:* "Yeah."

COUNSEL FOR THE DEFENDANT SETTLES: "I object, Judge."

THE JUDGE: "The objection's overruled."

*Q.:* "Did you see the third individual named Ricardo Parks?"

*A.:* "Yeah."

*Q.:* "Did you know Ricardo Parks by name at that time?"

*A.:* "No."

*Q.:* "How did you see know him [*sic*]?"

*A.:* "Well, I seen him around. I seen — I didn't know him like everybody else, you know what I'm saying?"

*Q.:* "Did you know Ricardo Parks by face —"

*A.:* "I seen him a couple of times —"

*Q.:* "— by sight?"

*A.:* "Well, sight."

*Q.*:   "Well, where had you seen him?"

*A.*:   "I seen him around like you see people around."

*Q.*:   "With respect to the fourth individual —"

Counsel for Settles interrupted and requested a side bar conference, which the judge granted. The conference was as follows:

COUNSEL FOR SETTLES: "This gentleman was shown photo arrays, according to discovery we've been given on one occasion, close in time to the incident and he failed to pick out my client's photograph. I made a motion that asked this Court to protect me from any in-court identification procedure which would be unnecessarily suggestive. Now, if [the prosecutor] knew that this witness was going to make an in-court identification of my client based on a confrontation where there are five black males — young black males at counsel table — so it's absolutely crystal clear to anyone that's on the witness stand who is on trial and who isn't. I find that to be outrageous and I want to know what's going on before he makes an in-court identification. I specifically asked if there was going to be an identification procedure that I would participate in the line up, that I wanted to be in the line up, and that no eyewitness should be confronted with my client for the first time in the courtroom and asked to make an identification."

COUNSEL FOR LEE: "Judge, my objection was somewhat different because I did not file such a motion. On other hand, the objection was based upon the fact that one by one [the prosecutor] was pointing at the Defendants and leading this witness and asking if they were present. I'd suggest, Judge, that even without a motion for identification procedure, that is unnecessarily suggestive. This individual could have said he had identified my client, he could have —"

THE JUDGE: "He said all of them, first."

COUNSEL FOR LEE: "But Judge, I'm sitting there,

too, and the courtroom is full. Who knows who he's talking about."

THE JUDGE: "He said all of them."

COUNSEL FOR LEE: "He did not point, your Honor. He did not — he said 'all of them,' but it was unclear and that's why [the prosecutor] —"

THE JUDGE: "It was — what was unclear?"

COUNSEL FOR LEE: "Who 'them' was, and that's why [the prosecutor] resorted to pointing at them one by one."

THE PROSECUTOR: "If a similar —"

THE JUDGE: "We have — all right. I'm happy to hear from the Commonwealth, then I'll tell you my ruling."

THE PROSECUTOR: "To the extent — with respect to [counsel for Settles] —"

THE JUDGE: "He can't hear you."

THE PROSECUTOR: "With respect to [counsel for Settles] objection and concerns, I did not know that this witness was going to say that 'I saw all of them there.' It has been my understanding that pursuant to discovery, this witness was going — is going to testify consistent with his police report and his grand jury testimony. To the extent that I just asked a question that has been objected to because of the unfairness of the presentation, I will not — I will withdraw the question and I will move on to the fifth individual who's been identified as Lazell Cook."

COUNSEL FOR SETTLES: "But he's now said 'all of them —' "

THE JUDGE: "Well, but he didn't know he was going to say that. Now you can have him ask him."

COUNSEL FOR SETTLES: "Well, that's why I filed my motion that there'd be line up procedures before confrontation —"

THE JUDGE: "All right. Your objection's overruled. Now, do you want to — and you may continue to inquire."

Settles' motion, quoted above, sought a lineup procedure with respect to any witness that the prosecutor intended to call for the purpose of identifying Settles. Nothing in the record suggests that the prosecutor expected Taylor to identify Settles. No judicial error, prosecutorial misconduct, or unfairness occurred. Indeed, the following testimony of Taylor, elicited on cross-examination by Settles's attorney strongly suggests that the identification testimony was relatively, or completely, harmless and came as a surprise to the prosecutor:

> *Q.:* "Sir, on February — you pointed out Ronald Settles on Wednesday. You said, all of them, remember that, all of them were there? Do you remember that?"
>
> *A.:* "Yes, I remember —"
>
> *Q.:* "Ronald Settles was sitting right where he's sitting today, correct?"
>
> *A.:* "Um."
>
> *Q.:* "On Wednesday?"
>
> *A.:* "Wait a second, I said all of them were there?"
>
> *Q.:* "Yes."
>
> *A.:* "Who's Ronald Settles?"
>
> *Q.:* "Prior to January 25, 1990, you had never even heard the name Ronald Settles, correct?"
>
> *A.:* "Correct."
>
> *Q.:* "This is Ronald Settles, right here."
>
> *A.:* "Okay."

*Q.*: "Ever seen him around the neighborhood in Matta-
pan prior to January 25, 1990?"

*A.*: "No, I don't recall seeing him."

*Q.*: "In fact, prior to January 25, 1990, you'd never
seen him in your life, correct?"

*A.*: "Correct."

*Q.*: "On Wednesday you sat in that very seat and said
all of them, remember that? You don't remember
that?"

*A.*: "I don't know, all of them most likely was there.
He's the one I didn't identify because I didn't know
him, just like you said."

". . ."

*Q.*: "Do you recall, on Wednesday of this week, sitting
where you're sitting now, and saying in answer to
the question, who do you see at counsel table that
was there? All of them."

*A.*: "I probably said all of them."

*Q.*: "You recall it now? Did you see Ronald Settles
there?"

*A.*: "I don't remember. I might have not identified him.
I don't remember."

*Q.*: "Well —"

*A.*: "Listen to what I'm saying. I didn't identify him, I
don't remember seeing him there, like, can you
understand, can you understand?"

". . ."

*Q.*: "Why did you think all of them on Wednesday?"

". . ."

*A.*: "I might have spoke premature, just like I said
your client, I did not pick him out in the photo-
graph because I did not know your client, so if I
was not lying then, why would I lie now about
your client?"

". . ."

    *A.:*   "I did not pick him out, I did not implicate him in
    doing anything, therefore, I'm sure if he did, I don't
    know him, or if he did anything."

(12) *Denial of defendant's requests to attend view.* Settles
argues that the judge violated his constitutional rights
guaranteed by the Sixth and Fourteenth Amendments to the
United States Constitution and art. 12 of the Massachusetts
Declaration of Rights when she denied his request to attend
the jury's view of Newtowne Court and the Cambridge police
station. We reject that argument.

    · We have held repeatedly that a defendant does not have a
right to be present during a jury view. *Commonwealth* v.
*Owens,* 414 Mass. 595, 604 (1993). *Commonwealth* v. *Curry,*
368 Mass. 195, 198 (1975). *Commonwealth* v. *Snyder,* 282
Mass. 401, 414 (1933), aff'd, 291 U.S. 97 (1934). *Com-
monwealth* v. *Dascalakis,* 246 Mass. 12, 31 (1923). More
specifically we have stated that "[i]t is a violation of neither
the Fourteenth Amendment to the United States Constitu-
tion, *Snyder* v. *Massachusetts,* 291 U.S. 97 (1934), affirming
*Commonwealth* v. *Snyder,* 282 Mass. 401 (1933), nor art. 12
of the Declaration of Rights of the Massachusetts Constitu-
tion, *Berlandi* v. *Commonwealth,* 314 Mass. 424, 449-453
(1943), to conduct a view in the absence of the defendant."
*Commonwealth* v. *Curry, supra.* We continue to adhere to
that view.

    (13) *Sufficiency of the evidence to warrant Lee's conviction
of murder of Rigoberto Carrion.* The theory of the Com-
monwealth's murder case against Lee was felony-murder;
that he was a joint venturer in the armed robbery of Jesse
McKie and that Carrion was killed during the commission of
that felony. There was evidence that Lee intentionally encour-
aged or assisted Gordon in the armed robbery and that he
did so while sharing with Gordon the mental state required
for that crime. Thus, the evidence was sufficient to warrant
Lee's conviction of the armed robbery. *Commonwealth* v. *Or-
tiz,* 408 Mass. 463, 466-467 (1990). Lee does not contend
otherwise. The critical question as to Lee's murder conviction
is whether there was evidence that Carrion's death occurred
in the course of that armed robbery. *Id.* at 467. Accord *Com-*

*monwealth* v. *Nichypor*, 419 Mass. 209, 215 (1994). If it did, Lee was guilty of murder in the first degree. G. L. c. 265, § 1 (1994 ed.).

"In reviewing the denial of a motion for a [required finding] in a criminal case, we determine whether the evidence offered by the Commonwealth, together with reasonable inferences therefrom, when viewed in its light most favorable to the Commonwealth, was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every element of the crime charged." *Commonwealth* v. *Campbell*, 378 Mass. 680, 686 (1979). See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). "It was not necessary for the Commonwealth to show that the homicide[] occurred while the [armed robbery] was still in progress, as long as the homicide[] [was] connected with and incident to the [armed robbery] and as long as the [armed robbery] and the homicide[] took place at substantially the same time and place." *Commonwealth* v. *Ortiz, supra* at 466. Accord *Commonwealth* v. *Nichypor*, 419 Mass. 209, 215 (1994). Lee asserts that the killing of Carrion was completely gratuitous and unrelated to the robbery while the Commonwealth says that it was connected with and incident to the robbery. We are satisfied that the evidence warranted that the killing occurred in connection with and incident to the armed robbery and at substantially the same time and place.

A homicide may be deemed to be connected with and incident to a felony if "the homicides occurred as part of the defendant's effort to escape responsibility for the underlying felony." *Commonwealth* v. *Ortiz, supra.* The Commonwealth argued to the jury that Carrion was killed because he was a witness to the killing of McKie. Although there was no testimony that Carrion was killed for that specific reason, it was a reasonable inference to have been drawn from the evidence introduced. Tracy Williams testified that he, McKie, and Rigoberto Carrion had arrived together at Newtowne Court. Williams testified that he observed the defendant Gordon stab McKie as other members of the group viciously beat McKie. On hearing McKie's cries for help Williams left the Newtowne Court to find the police. Williams further testified that during the beating and stabbing of McKie, Carrion was standing in the entranceway about ten to fifteen feet from McKie and facing the direction of the beating. Earle Taylor,

another eyewitness, further corroborated Williams' testimony. Taylor testified that after the group had beaten and stabbed McKie, Carrion attempted to leave the area, but the group converged on him beating and fatally stabbing him. The killing of the only remaining eyewitness associated with the first murder victim could reasonably be inferred as an attempt to escape responsibility for the armed robbery. We note that, although there may have been other inferences possible, under the sufficiency of the evidence standard, we need only consider whether the inference was "reasonable and possible." *Commonwealth* v. *Cohen*, 412 Mass. 375, 380 (1992). See *Commonwealth* v. *Latimore, supra* at 676 (inferences sufficient if not "too remote according to the usual course of events"). In addition, the Commonwealth introduced evidence which supported the jury's finding that the killing occurred at substantially the same time and place of the armed robbery as evidenced by testimony indicating the fatal stabbing of Carrion took place moments after the group had finished their vicious attack on McKie. Furthermore, because Carrion's murder occurred during the course of the robbery, the Commonwealth satisfied its burden that the felony was independent of Carrion's homicide. *Commonwealth* v. *Ortiz, supra* at 466-467. See *Commonwealth* v *Quigley*, 391 Mass. 461, 465-466 (1984), cert. denied, 471 U.S. 1115 (1985).

In addition to the requirement that the deaths occurred in the course of the robbery, the Commonwealth was required to establish that the deaths were the natural and probable consequences of the felony. *Commonwealth* v. *Ortiz, supra* at 467; *Commonwealth* v. *Matchett*, 386 Mass. 492, 504-505 (1982); *Commonwealth* v. *Devlin*, 335 Mass. 555, 566-567 (1957). It is evident that in the instant case the killings of McKie and Carrion were part of a continual criminal transaction. If it were not for the underlying felony, it is probable that McKie would not have been beaten and stabbed. Similarly, if it were not for the killing of McKie, and if Carrion had not witnessed the killing, it is probable that Carrion would not have been attacked, beaten, and fatally stabbed. However, because the underlying felony of armed robbery did occur, and because McKie was killed, and because Carrion did witness the entire event, the jury were warranted in concluding that the death of Carrion was a natural and probable consequence of the armed robbery.

We conclude that there was sufficient evidence introduced at trial to support each element the Commonwealth was required to prove beyond a reasonable doubt in order to secure a conviction of first degree murder based on a theory of joint venture felony-murder.

(14) *The judge's refusal to instruct jury concerning possibility of Lee's having received stolen property.* Lee requested the judge to instruct the jury that if they were to find that it was as likely that Lee only received McKie's stolen jacket from another person as that he participated in the theft, they must find him not guilty of robbery. The judge rightly declined to give that instruction. The requested instruction would not have been incorrect, but it would have added nothing of value to the instructions the judge gave with respect to the elements of the crime with which Lee was charged, armed robbery, and the Commonwealth's burden to prove each of those elements beyond a reasonable doubt.

(15) *Did the judge err as to Settles by giving a consciousness of guilt instruction without limiting it to Gordon and Lee?* Settles argues that the judge's jury instruction on consciousness of guilt was erroneous because there was no evidence of his consciousness of guilt. We agree that there was no evidence of Settles' consciousness of guilt but we do not agree that the instruction was erroneous. In connection with her instruction on that subject, the judge did not mention Settles or any of the defendants by name. She simply told the jury that, if they were to find that a defendant had fled, made false statements, or concealed or destroyed evidence, they could, but were not required to, consider such evidence as consciousness of guilt on that defendant's part. Settles objected to that instruction stating that it allowed the jury to consider that there was evidence of Settles' consciousness of guilt. Counsel did not directly request the judge to tell the jury that there was no evidence of Settles' consciousness of guilt or that her consciousness of guilt instruction was limited to the cases against Gordon and Lee.

Although it would have been preferable for the judge to have explicitly limited her consciousness of guilt instruction to Gordon and Lee, we are not persuaded that the general instruction could reasonably be construed by the jury as suggesting that there was any evidence of Settles' consciousness of his own guilt (as distinguished from his consciousness of

the guilt of Gordon and Cook — passengers in Settles' vehicle following the incident). We conclude that there was no error.

(16) *G. L. c. 278, § 33E, relief.* After thorough review of the law and the evidence, we are persuaded that we should not exercise our extraordinary power under G. L. c. 278, § 33E, to reverse or reduce the murder convictions of Gordon and Lee.

*Judgments affirmed.*