## COMMONWEALTH *vs.* TIMOTHY DUGUAY.

Plymouth. October 6, 1999. - December 7, 1999.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, & IRELAND, JJ.

*Evidence,* Admissions and confessions, Scientific test, Polygraph test, Expert opinion. *Constitutional Law,* Admissions and confessions. *Practice, Criminal,* Admissions and confessions, Argument by prosecutor, Capital case.

A statement made by a murder suspect as he voluntarily accompanied police officers to the police station was properly admitted in evidence. [400-401]

At a murder trial, expert testimony regarding the results of an ortho-tolidine test to screen for the presence of blood on the defendant's person, clothing, house, and car was properly admissible in evidence without additional confirmatory evidence of blood. [401-402]

At the trial of a murder indictment, the judge correctly excluded polygraph evidence proffered by the defendant, where there was insufficient foundation laid to demonstrate the accuracy of the examination or the reliability of the process used. [402-403]

Evidence at a murder trial warranted the judge's denial of the defendant's motion for a finding of not guilty. [403]

At the trial of a murder case, there were no reversible errors in the prosecutor's closing argument, to which the defendant made no objection, where the prosecutor's remarks were based on the evidence and responded fairly to defense counsel's argument; further, no prejudice to the defendant arose from the prosecutor's improper reference to the punishment for the crime charged, where the judge immediately struck the reference and gave curative instructions to the jury. [403-405]

INDICTMENT found and returned in the Superior Court Department on November 7, 1995.

A motion to suppress evidence was heard by *Patrick F. Brady,* J., and the case was tried before *John A. Tierney,* J.

*Donald A. Harwood* for the defendant.

*Mary E. Mullaney,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. The defendant, Timothy Duguay, appeals from his conviction of murder in the first degree on the theory of extreme atrocity or cruelty. The defendant challenges (1) the denial of

his motion to suppress a statement he made to a police officer in a police cruiser while en route to the police station; (2) the admission in evidence of ortho-tolidine test results; (3) the exclusion of polygraphic evidence; (4) the denial of his motion for a required finding of not guilty; and (5) the propriety of the prosecutor's closing argument. He also requests relief pursuant to G. L. c. 278, § 33E. We conclude that the conviction should be affirmed, and that there is no reason to grant the defendant a new trial or enter a verdict of a lesser degree of guilt pursuant to G. L. c. 278, § 33E.

We recite the evidence in the light most favorable to the Commonwealth. *Commonwealth* v. *Salemme*, 395 Mass. 594, 595 (1985). The victim was killed shortly before 8 P.M. at his home. He was stabbed twenty-one times in his neck, face, and chest. At the time of the murder, the victim was seventeen years old and the defendant was twenty-three years old.

The defendant and the victim were neighbors and lived just a few houses away from each other. When the defendant was seventeen years old and the victim was twelve years old, they became involved in a homosexual relationship. Their relationship continued over the next five years, until the victim's death. The victim alternated between maintaining intimacy with the defendant and distancing himself from the defendant.

Throughout this period, the defendant and the victim had several disagreements. Four days before the victim's death, the defendant received a judgment against the victim. That judgment required the victim to pay back money that he had borrowed from the defendant. The defendant had previously told a friend that he would rather the victim spend the night with him (the defendant) than pay back the money. That evening, according to the defendant, a Thursday, the defendant and the victim spent the night together and were intimate.

After that evening, the defendant and the victim planned to spend the following Sunday night together, one night before the victim's murder. The defendant and the victim did not spend Sunday night together; instead, the victim went out with a girl friend and then spent the night at his own house.[1] The following morning, the defendant called the victim and demanded to know where the victim had been the night before. The defendant also

---

[1] The victim lived with his mother, her boy friend, his siblings, and his uncle. His uncle had moved in with the family approximately one week before the victim's death. His uncle was an admitted cocaine user and dealer. The

drove to the victim's house twice that day. Each time, the victim refused to talk to the defendant and told him to leave.

The defendant had a telephone conversation approximately one to two hours before the victim was killed during which he told a friend that he was tired of being "hurt" by the victim. He also said he was going to kill the victim. Approximately twenty minutes before the victim's death, the defendant telephoned the victim's home and left a recorded voice message for the victim's mother. In this message, the defendant told the victim's mother of his homosexual relationship with the victim. He also said that the victim was "going to answer for the head games he's played with me," and that the victim was "not going to threaten me . . . because I'm just going to turn myself in and I've already started that." He also instructed the victim's mother to "get ready for a fun ride at the courthouse."

Shortly before eight, the victim stumbled out of his house. A relative of the victim, who lived in a neighboring house, saw the victim and telephoned emergency services. As the first emergency vehicle pulled onto the victim's street, the driver noticed a person in dark clothing walking away from the victim's house. This person displayed no apparent physical response to a loud scream coming from the direction of the victim's house. Emergency medical personnel were not able to resuscitate the victim. He died on the way to a hospital from blood loss caused by multiple stab wounds to his neck, face, and chest.

After learning from a neighbor that the defendant's vehicle was seen leaving the front of the victim's house "earlier in the evening, before this happened," the police went to the defendant's house. When the police arrived, the defendant told them that he knew they were coming. The police then recited Miranda warnings.[2] The defendant got his jacket and then rode in a cruiser to the police station. On the way to the police station, the defendant asked an officer what the police wanted to know. The officer told the defendant "[j]ust tell them what happened." The defendant then said, "If I tell you what happened, you'll put me in jail for the rest of my life."

---

victim told a friend that "there was somebody out to get his uncle [and the victim] slept with a knife under his pillow."

[2]The Miranda warnings given at this time were incomplete because the detective failed to inform the defendant that, if he could not afford an attorney, he had the right to court-appointed counsel.

The police again advised the defendant of the Miranda warnings. The police then began an interview at the police station. The defendant initially denied having a sexual relationship with the victim. After the police told him that they knew about the message he had left for the victim's mother, he admitted to his homosexual relationship with the victim. He discussed his recent communications with the victim. He told the police that he had been wearing the same clothing since the middle of the day. The defendant's clothes were dark.

The defendant consented to testing for the presence of blood on his person and on his clothing. A police chemist performed an ortho-tolidine test. This test is for screening only because it yields a positive result for substances as diverse as vegetation, food items, and detergents, as well as for human blood. The defendant tested positive on his hands, the soles of his feet, and the soles of his sneakers. The back of his left hand and his socks did not test positive.

Subsequently, the police obtained a search warrant and performed the same testing on the defendant's house, car, and clothing. No blood was visible to the eye, but the results were positive in the defendant's bathtub, car, on a light switch, and clothing. The police did not find the defendant's fingerprints at the victim's house. Furthermore, hairs found at the victim's house were inconsistent with the victim's and the defendant's hair.

1. *Denial of the defendant's motion to suppress.* The defendant contends that the statement he made to the police on the way to the police station should be suppressed. The defendant correctly states that the Miranda warnings given before he entered the police cruiser were deficient. He also correctly notes that statements made by a defendant in police custody in response to interrogation must be suppressed when the Miranda warnings are deficient. The defendant also, however, makes three assertions that are not correct. He asserts that he was in custody when he made the statement; that the officer's comment[3] was "tantamount to questioning"; and that his statement was not voluntary.

As the motion judge found, the defendant is incorrect with respect to all three of these assertions. First, the defendant was

---

[3]In response to a question from the defendant, the officer advised the defendant to tell the detective what had happened.

not in custody at the time he made the statement. He was not forced to go to the police station; rather, he agreed to accompany the police officers there. See *Commonwealth* v. *Eagles*, 419 Mass. 825, 832-833 (1995); *Commonwealth* v. *Phinney*, 416 Mass. 364, 370 (1993). "[T]here is no arrest unless a reasonable person on the scene would perceive that the defendant[] [was] being forcibly detained." *Commonwealth* v. *Parker*, 402 Mass. 333, 339 (1988), *S.C.*, 412 Mass. 353 (1992), and 420 Mass. 242 (1995).

Second, the officer's comment did not amount to questioning. The officer did not initiate the conversation. The defendant did. The officer merely answered the defendant's question. See *Commonwealth* v. *Cote*, 386 Mass. 354, 360 (1982). Contrast *Brewer* v. *Williams*, 430 U.S. 387, 400 (1977).

Finally, the defendant's contention that the statement was not voluntary has no merit. The defendant, without prompting, blurted out a statement. Because voluntary statements made by a defendant without any police coercion are admissible in evidence, *Commonwealth* v. *Diaz*, 422 Mass. 269, 271 (1996), the motion to suppress was correctly denied.

2. *Admission of expert testimony concerning the results of the ortho-tolidine test.* The defendant argues that the judge erred when he allowed expert testimony concerning the results of the ortho-tolidine test, a test that screens for the presence of blood. The defendant concedes that under *Commonwealth* v. *Gordon*, 422 Mass. 816 (1996), expert testimony as to the results of ortho-tolidine testing is admissible in Massachusetts. However, the defendant attempts to distinguish *Gordon* by arguing that there was additional blood evidence establishing the defendants' guilt in the *Gordon* case. The defendant notes that some other States have found error where the results of presumptive tests were admitted without additional confirmatory evidence. The defendant also contends that the ortho-tolidine test results should be excluded because the danger of prejudice is greater than the probative value of the test results.

In *Commonwealth* v. *Gordon*, *supra* at 842, we held that results of ortho-tolidine tests are admissible in evidence. We did not qualify the admission of the results on the availability of additional confirmatory evidence. We decline to do so now. " 'The defendant's argument goes only to the weight of the evidence, not to its admissibility, and it is for the jury to determine — after listening to cross-examination and the closing arguments

of counsel — what significance, if any, they will attach to the discovery' of blood on the defendant's possessions [and person]." *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 745 (1990), quoting *Commonwealth* v. *LaCorte*, 373 Mass. 700, 702 (1977). The Commonwealth need not adduce additional confirmatory evidence before offering the results of the ortho-tolidine test.

The defendant is concerned that the test will be excessively prejudicial. We do not agree. Here, as in *Gordon*, the evidence was presented with an abundance of precaution. The chemist informed the jury that it was a presumptive, or screening, test and that it was capable of producing false positives. She explained that, even when there is a positive result, that does not mean that there is human blood on the surface tested. The expert also explained that the test is extremely sensitive and yields a positive result even for a minuscule amount of blood. Under cross-examination, she acknowledged a long list of substances other than human blood that could yield a positive result. Defense counsel freely and repeatedly pointed out the limitations of the test. Admission of the result of the ortho-tolidine test was not error.

3. *Exclusion of polygraph test.* The defendant contends that the judge abused his discretion by excluding expert testimony by a polygraph examiner. In *Commonwealth* v. *Stewart*, 422 Mass. 385, 389 (1996), we stated that, "[i]f polygraphic evidence is to be admissible in a given case, it seems likely that its reliability will be established by proof in a given case that a qualified tester who conducted the test had in similar circumstances demonstrated, in a statistically valid number of independently verified and controlled tests, the high level of accuracy of the conclusions that the tester reached in those tests." The defendant does not dispute that the examiner did not establish the accuracy of his examination through a showing of independent testing. Thus, the judge did not commit error by excluding the polygraph test.

The defendant suggests that the standard stated in *Stewart* is inappropriate for polygraph evidence because the requirements establish an impossible bar to the admission of polygraphic evidence. We disagree. There is nothing to suggest that an expert polygraph examiner could not design a test to meet the criteria outlined in *Stewart*.

Finally, the defendant urges that the evidence should be

admissible under *Commonwealth* v. *Lanigan*, 419 Mass. 15 (1994), in which this court adopted the standard set forth in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In *Lanigan, supra* at 26, we stated that, "[i]f the process or theory underlying a scientific expert's opinion lacks reliability, that opinion should not reach the trier of fact. Consequently, the judge must rule first on any challenge to the validity of any process or theory underlying a proffered opinion." Here, the judge found that the process lacked the necessary reliability because the polygraph examiner was unable to demonstrate the accuracy of his findings through independent testing. Thus, the examiner could not adequately support the process underlying his opinion.[4] Consequently, the judge was correct to exclude the testimony of the polygraph examiner based on the polygraph examination.

4. *Denial of the defendant's motion for a required finding of not guilty.* In reviewing the denial of the defendant's motion, we review the evidence in the light most favorable to the Commonwealth. We have met that standard. See *supra* at 398-400. The defendant argues that other facts support a finding of not guilty. Conflicting evidence is for the jury. The defendant's motion for a required finding of not guilty was correctly denied.

5. *Propriety of the prosecutor's closing argument.* The defendant contends that the prosecutor made a number of prejudicial remarks during her closing argument. Though we have cautioned prosecutors against pressing the bounds of propriety, we conclude that there is no basis for reversing the conviction on this ground.

There is not a bright line rule that we can use to determine whether a prosecutor's closing argument is fair or improper. *Commonwealth* v. *Kozec*, 399 Mass. 514, 516-517 & nn.1-6 (1987). We review a number of relevant factors on a case-by-case basis. *Id.* at 518. During this review, "we must and do recognize that closing argument is identified as argument, the jury understands that, instructions from the judge inform the jury that closing argument is not evidence, and instructions may mitigate any prejudice in the final argument." *Id.* at 517.

We also note that defense counsel did not object at the time

---

[4]A polygraph examination does not, itself, determine whether the subject is telling the truth. Rather, the examination provides data that the polygraph examiner analyzes to form an opinion as to whether the subject is telling the truth.

of the closing argument.[5] "Although not dispositive of the issue, the absence of any such request from experienced counsel is some indication that the tone, manner, and substance of the now challenged aspects of the prosecutor's argument were not unfairly prejudicial." *Commonwealth* v. *Toro*, 395 Mass. 354, 360 (1985).

The defendant complains that the prosecutor made improper arguments with respect to the ortho-tolidine tests, the victim's wounds, and the defendant's knowledge of the clothing the victim was wearing at the time of his death. In a closing argument, the prosecutor may "comment on evidence developed at trial and draw inferences from such evidence." *Commonwealth* v. *Chavis*, 415 Mass. 703, 713 (1993). Here, evidence regarding each of these items was presented at trial. In her closing argument, the prosecutor drew the jury's attention to this evidence and then made inferences from this evidence. Although not all of these inferences were particularly strong, all were founded on the evidence presented.

Next, defendant contends that the prosecutor committed error by introducing a "conspiracy theory." Although a prosecutor's introduction of a conspiracy theory has been found to be improper, *Commonwealth* v. *Thomas*, 401 Mass. 109, 115 (1987), the defendant misconstrues the prosecutor's remarks. Here, defense counsel made several statements implying the existence of a conspiracy against the defendant. The prosecutor rebutted this argument. In her rebuttal, she put the label of "conspiracy" on what the defense counsel had merely insinuated, but she did not introduce the notion of a conspiracy. It is not error for the prosecutor to provide a fair, unemotional response to defense counsel's argument.

Finally, the defendant correctly notes that the prosecutor made an improper statement regarding the punishment for the crime charged. Although it is clearly error for the prosecutor to address the issue of punishment, it was not prejudicial in this case because the judge immediately struck the statement. Further, in the instructions to the jury, the judge reminded the jury not to consider statements that were struck from the record. Because we presume that the jury will follow the judge's instructions, *Commonwealth* v. *Pope*, 406 Mass. 581, 588

---

[5]In one instance, when the prosecutor referred to the sentence for the crime charged, the judge interrupted the prosecutor sua sponte.

(1990), we conclude that this remark does not require a new trial.

6. *Relief under G. L. c. 278, § 33E.* We have reviewed the record and conclude that the interests of justice do not require either a new trial or the entry of a verdict of a lesser degree of guilt. See G. L. c. 278, § 33E.

*Judgment affirmed.*